FILED

2013 Dec-23  AM 10:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **METLIFE AUTO & HOME INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-01762-NE** |
| | ) | |
| **CHRISTY REID, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDERS

Five claims have been asserted in this action. The first was framed in the complaint and amended complaint of plaintiff (and counterclaim defendant), Metropolitan Property & Casualty Insurance Company, doing business as "MetLife Auto & Home Insurance Company" ("*MetLife*"). Those pleadings asked this court to enter a judgment declaring that MetLife had no obligation under homeowner insurance policy number 396743859-0 to provide James P. Certain a defense to, or coverage for, the claims asserted against him in a civil action filed in the Circuit Court of Madison County, Alabama ("*the underlying suit* ").[1] That suit resulted in a jury verdict in the aggregate amount of $2.2 million: a sum that greatly exceeded the $100,000 limit of Mr. Certain's policy.

---

[1] *See* doc. nos. 1 (Complaint) and 35 (Amended Complaint).

The remaining claims were asserted in the Counterclaim of Avis Certain, who appears in her representative capacity as Executrix of the Estate of James P. Certain, deceased ("*Avis Certain*" or "*the Estate*").   The first Count of that pleading claims that MetLife breached its contractual obligations under James P. Certain's homeowner's policy by:  (*i*) "failing to inform" him (or, after his death, his mother, Avis Certain) "of any and all settlement demands or offers made in the underlying suit"; (*ii*) "failing to settle the underlying suit within the limits of the subject Policy . . . despite an opportunity to do so"; (*iii*) "failing to indemnity" James P. Certain or his Estate for "the judgment rendered in the underlying suit"; (*iv*) "failing to post a supersedes bond" on behalf of the Estate "for purposes of appeal" from the judgment entered in the underlying suit; and (*v*) "failing to appeal any aspect of the trial and/or excess verdict rendered in the underlying suit."[2]  Count Two of the Estate's Counterclaim alleges that MetLife's same failures breached the "enhanced obligation of good faith" imposed upon the company as a matter of law.[3]  Count Three alleges that MetLife negligently, recklessly, and wantonly failed to settle the underlying suit for an amount within James P. Certain's policy limits, despite several opportunities to do so.[4]  And, Count Four asserts that MetLife "intentionally and

---

[2] Doc. no. 44 (Answer and Counterclaim of Defendant Certain), at 17-18.

[3] *Id*. at 18-19 (citing *L & S Roofing Supply Co., Inc. v. St. Paul Fire & Marine Insurance Co.*, 521 So. 2d 1298 (Ala. 1987)).

[4] *Id*. at 20-21.

2

in bad faith failed to settle the underlying suit within Mr. Certain's policy limits, despite several opportunities to do so."[5]

The following opinion addresses two motions filed by MetLife.  The first is the Company's motion to dismiss its amended complaint seeking declaratory relief, as well as the Estate's counterclaims.  MetLife argues that, as a result of its satisfaction of the judgment entered in the underlying suit, all claims and counterclaims in this action have been rendered moot; and, thus, this court no longer possesses subject matter jurisdiction.[6] Alternatively, MetLife contends that summary judgment should be entered in its favor on the Estate's counterclaims.[7]

Both parties agree through briefs filed with the court that MetLife's declaratory judgment action and the Estate's first two counterclaims should be dismissed as moot.[8] Thus, the only issues addressed in this opinion are whether the Estate's counterclaims for negligent/reckless/wanton failure to settle the underlying suit (Count Three) and for bad

---

[5] *Id*. at 21.

[6] *See* doc. no. 74 (MetLife's Motion to Dismiss for Lack of Subject Matter Jurisdiction).

[7] *See* doc. nos. 81 (MetLife's Motion for Summary Judgment) and 82 (MetLife's Brief in Support of its Motion for Summary Judgment).

[8] *See* doc. no. 74 (MetLife's Motion to Discmiss for Lack of Subject Matter Jurisdiction) at 6-11; *see also* doc. no. 95 (Defendant/Counterclaim Plaintiff Certain's Response to MetLife's Motion for Summary Judgment) at 2 (conceding that "MetLife's declaratory judgment claims . . . were rendered moot by and through MetLife's voluntary payment to Christy Reid in exchange for her filing [a] satisfaction of the underlying judgment," and that the Estate's "contract-based claims in Count I (Breach of Contract) and Count II (Breach of Enhanced Obligations of Good Faith) of the Counterclaim Complaint were rendered moot following satisfaction of the underlying judgment") (alteration supplied).

faith (Count Four) should be dismissed, or summary judgment entered in favor of MetLife.[9]  Avis Certain argues that MetLife remains liable to the Estate for nominal and punitive damages stemming from the $2.2 million judgment entered against the Estate in the underlying suit.[10]  In addition, both parties have filed several motions to strike.[11]

## I. FACTS

The relevant facts are essentially undisputed, and began on May 22, 2006,[12] when James P. Certain engaged in sexual acts with Christy Reid in his home, as he and she had done on many previous occasions.[13]  The acts that occurred on May 22, 2006, however, apparently were substantially different from the couple's previous sexual encounters, because Christy Reid caused James P. Certain to be arrested and subsequently indicted

---

[9] ***Nota bene***:  Counterclaim-plaintiff, Avis Certain, also filed a motion for partial summary judgment in favor of the Estate.  *See* doc. no. 75 (Counterclaim-Plaintiff Certain's Motion for Partial Affirmative Summary Judgment).  Even so, that motion is not separately addressed in this opinion because the following discussion clearly indicates that the motion is due to be overruled and denied.

[10] *See, e.g.*, doc. no. 90 (Response to Motion to Dismiss), at 2–3, 8–12.

[11] Doc. no. 68 (MetLife's Motion to Exclude Testimony of Bernard Harwood); doc. no. 91 (Counterclaim-Plaintiff Certain's Objections and Motion to Strike Evidence Offered in MetLife's Motion to Dismiss); doc. no. 93 (MetLife's Motion to Strike); doc. no. 96 (Counterclaim-Plaintiff Certain's Objections and Motion to Strike Evidence Offered in MetLife's Motion for Summary Judgment).

[12] *See* doc. no. 35 (Amended Complaint) ¶ 5.

[13] According to Avis Certain, her son and Christy Reid met and began dating in August of 2003, nearly two years prior to the incident leading to this action, and during that relationship the two "engaged in various hardcore sexual acts and role play, much of which was captured on hundreds of hours of videotape and pictures."  Doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 1.  It only was on May 22, 2006 that Christy Reid "claimed that an incident occurred in Mr. Certain's home [that caused] her to sustain physical and emotional injuries."  *Id.* ¶ 2 (alteration supplied).

for the criminal offenses of kidnaping in the second degree, sexual abuse (by force) in the first degree, and domestic violence in the third degree.[14]

After spending more than a year in jail while awaiting trial,[15] Certain pled guilty on October 23, 2007 to the lesser offenses of unlawful imprisonment in the first degree and assault in the third degree,[16] both of which are Class A misdemeanors under the law of Alabama,[17] and was sentenced to time served.[18]

On April 30th of the following year, Christy Reid commenced the underlying suit in the Circuit Court of Madison County, Alabama.  Her complaint alleged five intentional torts — assault, battery, false imprisonment, intentional infliction of emotional distress, and wanton misconduct — as well as a claim of negligence.[19]

---

[14] *See* Madison County, Alabama Circuit Court criminal case files numbered CC-2007-403, -404, and -405.

[15] Certain posted a $100,000 bond and was released from custody on May 28, 2006, but on the condition that he have no contact with Christy Reid.  His bond was revoked on June 21, 2006, however, and he was recommitted to jail for the next fifteen months, awaiting trial.  *See* doc. no. 82 (MetLife's Memorandum of Law in Support of his Motion for Summary Judgment) ¶¶ 7-9.

[16] *See* Ala. Code § 13A-6-22 (assault in the third degree), and § 13A-6-41 (unlawful imprisonment in the first degree) (1975) (2005 Replacement Vol.).

[17] Class A misdemeanors are punishable under Alabama law by imprisonment in the county jail for a term not longer than one year, *id*. § 13A-5-7(a)(1), or a fine of not more than $2,000, *id*. § 13A-5-11(a)(1), or both.

[18] Doc. no. 35 (Amended Complaint) ¶ 7; *see also* doc. no. 30-3 (Record of Convictions).

[19] *See* doc. no. 74-1 (Exhibits in Support of MetLife's Motion to Dismiss for Lack of Subject Matter Jurisdiction), at ECF 1-7 (copy of state-court complaint).  **Note**:  "ECF" is the acronym for "Electronic Case Filing," a filing system that allows parties to file and serve documents electronically.  *See The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (19th ed. 2010) (allowing citation to "page numbers generated by the ECF header").  **Note**:  On the date Christy Reid commenced the underlying suit, the tort of wanton misconduct ("wantonness") was considered by the Alabama

The MetLife homeowner's insurance policy that was in force and effect on the date of the events that formed the basis of the claims alleged in the underlying suit afforded James P. Certain $100,000 in personal liability coverage.[20]   Accordingly, he asked the company to provide a defense.[21]   MetLife ultimately did so, but only pursuant to a July 14, 2009 letter reserving the company's right to contest coverage under the policy's exclusionary language.[22]   The pertinent portions of that letter stated:

> We need to inform you about a potential coverage problem for your recent claim with us.  While we continue to investigate this claim, you need to be aware that Metropolitan Property and Casualty Insurance Company is asserting this Reservation of Rights and notifying you of [the] same based on certain reasons including but not limited to the following:

> Homeowner Module HP 6000 0902 states in pertinent part:

> ### SECTION II – LOSSES WE DO NOT COVER

---

Supreme Court to be "the equivalent in law to intentional conduct."  *McKenzie v. Killian*, 887 So. 2d 861, 870 (Ala. 2004).  After the date of the jury verdict in the underlying suit, however, the Alabama Supreme Court overruled its prior decision in *McKenzie*, and held that wantonness and intentional torts are distinct concepts.  *See Ex parte Capstone Building Corporation*, 96 So. 3d 77, 87–88 (Ala. 2012).  Even so, the determination of whether wantonness is an intentional tort or a specie of negligence was not necessary for the resolution of the underlying suit, nor is that question material to the issues addressed in this opinion.

[20] *See* doc. no. 35 (Amended Complaint) ¶ 2; doc. no. 30-2 (MetLife Policy No. 396743859-0 issued to James P. Certain).

[21] *See*, *e.g.*, doc. no. 82 (MetLife's Memorandum of Law in Support of its Motion for Summary Judgment) ¶ 12 ("On or about June 9, 2009, Certain's mother, Avis Certain . . . reported a claim under Certain's homeowner's policy with MetLife (Policy # 396743859).") (citation and footnote omitted).

[22] *See* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 8; doc. no. 74-1 (Plaintiff's Evidentiary Submissions in Support of its Motion to Dismiss), Exhibit "D" (Reservation of Rights Letter), at ECF 12-13.

**COVERAGE F — PERSONAL LIABILITY AND COVERAGE G — MEDICAL PAYMENTS TO OTHERS**

1.     **Intentional Loss**.  **We** do not cover **bodily injury** or **property damage** which is *reasonably expected or intended by* **you** *or which is the result of* **your** *intentional and criminal acts or omissions*.  This exclusion is applicable even if:

   A.     **you** lack the mental capacity to govern **your** conduct;

   B.     such **bodily injury** or **property damage** is of a different kind or degree than reasonably expected or intended by **you**; or

   C.     such **bodily injury** or **property damage** is sustained by a different person than expected or intended by **you**.

*This exclusion applies regardless of whether* **you** *are actually charged with or convicted of a crime*.  However, this exclusion does not apply to **bodily injury** or **property damage** resulting from the use of reasonable force by **you** to protect persons or property.

. . . .

18.     **Abuse**.  **We** do not cover **bodily injury** caused by or resulting from the actual, alleged or threatened *sexual molestation or contact*, corporal punishment, *physical abuse*, mental abuse or emotional abuse of a person.  This exclusion applies whether the **bodily injury** is inflicted by **you** or directed by **you** for another person to inflict *sexual molestation or contact*, corporal punishment, *physical abuse*, mental abuse or emotional abuse upon a person.

19.     **Emotional and Mental Anguish**.  **We** do not cover

**bodily injury** caused by or resulting from emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury. However, this exclusion does not apply if the person seeking damages from emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury has first experienced direct physical harm.

. . . .

These policy provisions would apply based on the allegations of the complaint as noticed as well as the disposition of the criminal charges against you.

With respect to this loss, we are notifying you that Metropolitan Property and Casualty Insurance Company by its investigation, negotiation, settlement, or defense of this loss does not waive any of its rights or defenses under its policy with you. Moreover, this notification should not be construed as a waiver by Metropolitan Property and Casualty Insurance Company of any of its rights or defenses, whether now known or discovered in the future.[23]

MetLife divided Mr. Certain's request for the company to provide a defense to and indemnity for the claims alleged in the underlying suit into separately managed files: *i.e.*, "*a coverage file*," under which an attorney was retained to pursue the present action for a declaratory judgment; and, "*a claims, or defense file*," under which another attorney was selected to provide James P. Certain a defense in the underlying suit. According to Kenneth Lambert, MetLife's Home Office Claims Administrator, the files were split because, "[o]n the *claims* [*or defense*] *file*, [MetLife's] obligation is to represent the

---

[23] Doc. no. 74-1 (MetLife's Evidentiary Submissions in Support of its Motion to Dismiss), Exhibit "D" (Reservation of Rights Letter), at ECF 12-13 (**boldface emphasis** in original, *italicized emphasis* supplied); *see also* doc. no. 30-2 (MetLife Policy of James P. Certain), at ECF 4-5.

8

interest of the insured.  On the *coverage file*, the obligation is to represent the interest of MetLife.  *There's a conflict between those* [*obligations,*] *because there's a question of coverage*."[24]

MetLife selected Tracy Hendrix to serve as defense counsel for Mr. Certain in the underlying suit, and "tasked adjuster Laura King . . . with responsibility for handling the newly-formed claims file (*i.e.*, defense file) and acting as the main point-of-contact for attorney Tracy Hendrix."[25]

MetLife retained another attorney in a separate law firm, Jack Bains, to act as "coverage counsel, tasking him with investigation of coverage for the underlying claims,"[26] and prosecution of this declaratory judgment action.  He commenced the present action on September 1, 2009.  Jurisdiction was based upon the parties' diversity of citizenship, 28 U.S.C. § 1331(a)(2), and MetLife sought a declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., that the policy language quoted in the reservation of rights letter mailed to James P. Certain specifically excluded from coverage liability for "all intentional acts."[27]

---

[24] Doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 10 (quoting Lambert deposition) (emphasis and alterations supplied).

[25] *Id.* ¶ 13.

[26] *Id.* ¶ 11.

[27] *See supra* the quoted text accompanying note 23, and doc. no. 35 (Amended Complaint) ¶¶ 9-10.  The Clerk entered a default on the record of the case against defendant Christy Reid on

Flint Liddon, the attorney who represented Christy Reid, mailed a letter to Tracy Hendrix on March 16, 2011, offering to settle the underlying suit for "the limits" of James P. Certain's homeowner's insurance policy.[28]  Mr. Liddon did not then know that amount, "but suspected the limits to be $100,000.00."[29]

Ms. Hendrix communicated Flint Liddon's offer to claims adjuster Laura King, who then informed MetLife Manager Lora Thompson of the offer.[30]  MetLife did not itself communicate this settlement offer to James P. Certain, although it was company policy to do so.[31]  Tracy Hendrix testified that she left a voicemail message on Certain's telephone answering device, informing him of the offer,[32] but there is no evidence establishing that he actually received the message.[33]

Tracy Hendrix and claims adjuster Laura King were later informed that Jack Bains,

---

September 1, 2010, for Ms. Reid's failure to answer or otherwise respond to MetLife's complaint. *See* doc. no. 27 (Clerk's Entry of Default).

[28] *See* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 21.

[29] Doc. no. 77-6 (Affidavit of Flint Liddon), at ECF 2.

[30] *See* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 25.

[31] *See id.* ¶¶ 22 ("MetLife's policy requires that the company, independent of retained defense counsel, send its insured any time-limited, policy limits demands received, regardless of where the demand originated.") and 23 ("However, MetLife never sent Pete Certain or his Estate a copy of the March 16th time-limited, policy limits demand from Christy Reid.") (citations omitted).

[32] *Id.* ¶ 24 n.6.

[33] *Id*. ("While Ms. Hendrix claimed she left Mr. Certain a voicemail explaining that an offer had been made (Hendrix Dep. 46:2-14), she admitted that there is no evidence of any such phone call in her billing records or file notes and that she never received any indication from Mr. Certain that any such message was actually received by him (*id*. at 47:6-17 & 51:22-52:2).").

10

in his capacity of "coverage counsel," possessed the ultimate settlement authority, and that he would "exclusively" control all settlement negotiations.[34]  On March 21, 2011, less than a week after Flint Liddon's settlement offer, Bains filed a motion for summary judgment on behalf of MetLife in the present declaratory judgment action.[35]

During an April 12, 2011 teleconference among MetLife manager Lora Thompson, the coverage file claims adjuster, and the coverage file supervisor, Jack Bains was authorized to offer up to $25,000 to settle the underlying suit.[36]  Even so, Bains also was instructed to initially communicate a $5,000 counteroffer to Flint Liddon, and to attempt to settle the underlying suit for an amount between $5,000 and $10,000.[37]  Jack Bains communicated the counteroffer to Flint Liddon in a letter dated April 13, 2011.[38]

Liddon informed Christy Reid of MetLife's $5,000 counteroffer and obtained her authority to settle the underlying suit for an amount between $25,000 and $35,000.[39] Liddon also advised Ms. Reid that, before responding to MetLife's counteroffer, he would again request confirmation of the limits on James P. Certain's homeowner's

---

[34] *Id.* ¶ 25.

[35] *See* doc. no. 30.

[36] *See* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶¶ 27–28.

[37] *Id.* ¶¶ 30–31.

[38] *Id.* ¶¶ 32, 34.  Mr. Bains did not copy Ms. Hendrix on the letter, but did inform her via telephone that the offer had been made.  *See id.* ¶ 33.

[39] *See id.* ¶ 34.

11

policy.[40]  Liddon reiterated his request for confirmation of policy limits in an April 14,

2011 letter.[41]

Flint Liddon and Jack Bains spoke to one another the following day.[42]  Liddon's

account of the conversation is as follows:

> Jack [Bains] confirmed that the policy limits were $100,000.00.  I
> asked him if Metlife would ever be willing to pay any "real money".  Of
> course, he said that would depend on the definition of "real money".  I
> remember replying "in the five figure range, and not just $10,000.00."  I
> remember that he paused and thought, and then explained that Metlife felt
> very confident of its chances in the declaratory judgment action.  That if
> there ever were a set of facts to prove an intentional act [as that term is used
> in Mr. Certain's policy, then] this was it.  Also that since Mr. Certain had
> pled guilty to a misdemeanor [in the state court criminal proceedings,] that
> there was no argument but that the "unlawful acts" exclusion would apply.
> Jack did NOT say that Metlife would never pay into the five figures range.
> But I do recall that based upon what he said and the way he said it, along
> with his general tone and demeanor, that it would be a waste of time to
> negotiate at that point because Metlife was not willing to pay anything into
> five figures, or, if it were, that maybe ten or eleven thousand dollars was all
> it would pay.  After the declaratory judgment was mentioned I remember
> stating to Jack that Mr. Certain was not the typical "uninsured defendant,"
> and that he had significant assets.  I did not state this in a threatening
> manner but only as part of general chatting about the cases.  I left that
> conversation with the impression that Metlife was not willing to pay five

---

[40] *See id.*

[41] *See id.* ¶ 35.

[42] It is not clear whether this conversation occurred face-to-face, or over the telephone.  *See* doc. no. 77-6 (Evidentiary Material in support of Motion for Partial Affirmative Summary Judgment), Exhibit "G"(Affidavit of Flint Liddon), at ECF 2 ("After my reply to Jack I remember that the next day I talked to him in person. *I want to say that I ran into him on the street, but I cannot be sure it was not over the telephone.*") (emphasis supplied); *see also* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 36.

figures beyond maybe $10,000.00 or $11,000.00.  As a result I did not make a counter-demand at that time.[43]

As a result of Flint Liddon's failure to make a counteroffer, MetLife decided to focus on this declaratory judgment action.[44]

Tracy Hendrix, nevertheless, informed MetLife on several occasions that James P. Certain could be exposed to a judgment well in excess of the $100,000 policy limits if the underlying suit proceeded to trial.[45]  Indeed, on August 14, 2011, Ms. Hendrix sent an "updated pre-trial report" to MetLife adjuster Laura King that concluded with these statements:

> *At this point, I do not see a chance of prevailing at trial due to the nature of the video.*[46]  If Mr. Certain could locate any other prior videos that show this type behavior, we would certainly have a much better shot at prevailing as the plaintiff has denied any such prior incidents.  However, he has not been able to produce such videos to me.  This is certainly a case more of mental anguish as well as punitive damages.  I would not be surprised to see a verdict of up to $500,000.  It is my understanding that Mr. Certain has $100,000 in coverage.  Plaintiff's counsel previously made a time limited policy limits demand.  An offer [counteroffer] of $5,000 was extended to him.  *Given the circumstances of this case, I would*

---

[43] Doc. no. 77-6 (Evidentiary Material in support of Motion for Partial Affirmative Summary Judgment), Exhibit "G"(Affidavit of Flint Liddon), at ECF 2–3 (alterations supplied).

[44] *See* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 37.

[45] *See id.* ¶¶ 43–47.

[46] Incredibly, James P. Certain had made and retained a videotape of the May 22, 2006 incident for which he was criminally prosecuted, and that formed the basis of the claims in the underlying suit. *See, e.g., id.* ¶ 1 ("During their relationship. [Certain and Reid] engaged in various hardcore sexual acts and role play, much of which was captured on hundreds of hours of videotape and pictures.") (alteration supplied, citations omitted).

*recommend paying up to limits to obtain a release for Mr. Certain.*[47]

Tracy Hendrix's recommendation was communicated to Lora Thompson, the MetLife manager who had authorized settlement authority in the amount of $25,000, but not to Jack Bains,[48] who had been vested by MetLife with exclusive control over settlement negotiations, despite the fact that he also represented the company in this declaratory judgment proceeding.[49]

James P. Certain died on September 3, 2011.[50]  He was replaced by his mother, Avis Certain, in her representative capacity as the duly-appointed Executrix of her deceased son's estate.

The trial of the underlying suit commenced on April 30, 2012,[51] nearly eight months after the death of James P. Certain.  On May 1, 2012, the jury returned a verdict in favor of Christy Reid and against the Estate in the aggregate amount of $2.2 million

---

[47] Doc. no. 77-12 (Evidentiary Material in support of Motion for Partial Affirmative Summary Judgment), Exhibit "J", Part 3 (Metlife Claims File), at ECF 74 (alteration and emphasis supplied); *see also* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶ 47.

[48] *See* doc. no. 77-16 (Bains Deposition) at 14-22; *see also* doc. no. 76 (Statement of Undisputed Material Facts and Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment) ¶¶ 48–49.

[49] *See supra* text accompanying note 34.

[50] *See* doc. no. 34 (Plaintiff's Motion for Leave to Amend the Complaint); *see also* doc. no. 76 (Brief in Support of the Estate's Motion for Partial Affirmative Summary Judgment), at 13.

[51] *See* doc. no. 44 (Answer and Counterclaim) ¶ 23.

— *i.e.*, $1 million in compensatory damages, and $1.2 million in punitive damages[52] — twenty-two times greater than the policy limits. Judgment was entered against the Estate in the amount of the jury's verdict on May 2, 2012.[53]

Initially, both James P. Certain (and, following his death, his mother) appeared in the present action *pro se*, without the aid of counsel. Following the jury's $2.2 million verdict in the underlying suit, however, Avis Certain retained an independent attorney to represent the interests of the Estate. That attorney filed an answer to MetLife's amended complaint on June 29, 2012, and asserted the four counterclaims discussed in the introduction to this opinion. In essence, the Estate's counterclaims allege that by failing to settle the underlying suit for an amount within policy limits, failing to inform both James P. Certain (and, after his death, his mother) of the full scope of MetLife's settlement negotiations, failing to post a supersedeas bond, and failing to appeal the state court judgment, MetLife did not in good faith fulfill its contractual obligations, and intentionally subjected the Estate to an excess judgment.[54]

On May 31, 2012 — two weeks before the time for filing an appeal from the

---

[52] *See id.* ¶ 25; *see also* doc. no. 74-1 (Plaintiff's Evidentiary Submissions in Support of its Motion to Dismiss), Exhibit "E" (Verdict in Madison County Circuit Court Case No. CV-2008-900393).

[53] *See* doc. no. 74-1 (Plaintiff's Evidentiary Submissions in Support of its Motion to Dismiss), Exhibit "E" (Judgment in Madison County Circuit Court Case No. CV-2008-900393).

[54] *See id.* ¶¶ 27–36.

judgment in the underlying suit expired — the Estate and Christy Reid signed a forbearance agreement: *that is*, Reid agreed not to execute on the judgment, and the Estate agreed not to appeal the judgment, until the present declaratory judgment proceeding was resolved.[55]  (If the Forbearance Agreement had not been executed, the time for filing an appeal under the Alabama Rules of Appellate Procedure would have

---

[55] *See* doc. no. 74 (MetLife's Motion to Dismiss for Lack of Subject Matter Jurisdiction) ¶ 9.  The pertinent text of the foreebearance agreement reads as follows:

> COMES NOW Avis Certain, as executrix of the Estate of James P. Certain, deceased, along with her attorneys Erby J. Fischer and Victoria L. Dye of the law firm Fischer & Associates, LLC (collectively "**The Certain Parties**"); and Christy Reid, along with her attorney J. Flint Liddon of the law firm Bear & Liddon (collectively "**The Reid Parties**"), and hereby voluntarily acknowledge and agree:

> *THAT FOR DUE CONSIDERATION GIVEN,* **The Certain Parties** expressly promise: (a) Not to file any post-trial motions, including a motion for new trial and/or remittitur, in the matter of Christy Reid v. Avis Certain, as executrix of the Estate of James P. Certain, deceased (Circuit court of Madison County, Alabama; CV -08-900393); and, (b) Not to sell, destroy, or otherwise dispose of any assets in the Estate of James P. Certain, deceased during the term and duration of this Agreement.

> *IN CONSIDERATION OF THE ABOVE-DESCRIBED PROMISES,* **The Reid Parties** expressly promise:  (a) To refrain from executing judgment upon the assets in the Estate of James P. Certain, deceased, until the declaratory judgment action styled MetLife Auto & Home Insurance Company v. Christy Reid and Avis Certain, as executrix of the Estate of James P. Certain, deceased (United States District Court for the Northern District of Alabama, North Eastern Division; 09-cv-1762-CLS), and any counterclaims filed therein, are fully and finally resolved, including any appeals; and, (b) That in recognition of the burden on the Estate of James P. Certain in defending the declaratory judgment action and pursuing counterclaims therein, **The Reid Parties** will not compromise or otherwise satisfy judgment in the matter of Reid v. Certain (Circuit Court of Madison County, Alabama), without the express written consent of **The Certain Parties** . . . .

Doc. no. 74-1 (Plaintiff's Evidentiary Submissions in Support of its Motion to Dismiss), Exhibit "F" (Agreement between Estate and Christy Reid), at ECF 18-19 (emphasis and boldface in original).

lapsed on June 13, 2012.[56])

Nearly one year later — *i.e.*, on April 19, 2013, during the pendency of the present action — MetLife and Christy Reid reached a settlement of the judgment that had been entered in the underlying suit.[57]   MetLife agreed to pay $1.1 million to Reid in full satisfaction of the judgment, and Reid agreed to release all property liens and claims against the Estate.[58]   Christy Reid subsequently filed a Satisfaction of Judgment in the Circuit Court of Madison County, Alabama,[59] and, released all notices of *lis pendens* that had been filed in the Probate Records of the same county.[60]   MetLife filed the subject motion to dismiss all claims in the present action for lack of subject matter jurisdiction on May 24, 2013.[61]

## II.  DISCUSSION

---

[56] The Alabama Rules of Appellate Procedure provide that "the notice of appeal . . . shall be filed with the clerk of the trial court within 42 days (6 weeks) of the date of the entry of the judgment or order appealed from . . . ").  *See* Ala. R. App. P. 4(a)(1).

[57] *See* doc. no. 74 (Motion to Dismiss) ¶ 11; doc. no. 90 (Response to Motion to Dismiss), at 2–3.

[58] *See* doc. no. 74-1 (Exhibits to MetLife's Motion to Dismiss for Lack of Subject Matter Jurisdiction), Ex. "G" (April 19, 2012 email from Edward M. (Ted) Holt to Flint Liddon providing, in pertinent part, that:  "This will confirm that MetLife had agreed to pay $[1.1 million] in full and final settlement of the judgment your client obtained in CV-08-900393 in the Circuit Court of Madison County, Alabama. . . .") (alteration supplied); *see also* doc. no. 90 (Response to Motion to Dismiss), at 2–3.

[59] *See* doc. no. 74-1 (Exhibits to MetLife's Motion to Dismiss for Lack of Subject Matter Jurisdiction), Ex. "H" (Satisfaction and Release of Judgment).

[60] *Id.*, Exs. "I" and "J."

[61] *See* doc. no. 74 (Motion to Dismiss), at 1–2.

17

The earliest case based upon Alabama law to address an insurance company's liability for failing to settle a claim within an insured's policy limits was *American Mutual Liability Insurance Co. of Boston v. Cooper*, 61 F.2d 446 (5th Cir. 1932), in which the former Fifth Circuit observed that an insurance company

> cannot escape liability by acting upon what it considers to be for its own interest alone, but it must also appear that it acted in good faith and dealt fairly with the insured.  The insurer, as it had a right to do under the policy, assumed exclusive control of the claim against the insured, and took unto itself the power to determine for the insured all questions of liability, of settlement, of defense and management before and during trial, and of appeal after final judgment.  We are of [the] opinion that *this relationship imposes upon the insurer the duty*, not under the terms of the contract strictly speaking, but because of and flowing from it, *to act honestly and in good faith toward the insured*.  . . .

*Id*. at 448 (alteration and emphasis supplied).  *Accord Hartford Accident & Indemnity Co. v. Cosby*, 277 Ala. 596, 604-05, 173 So. 2d 585, 592-93 (1965).

The Alabama Supreme Court subsequently held in *L & S Roofing Supply Co., Inc. v. St. Paul Fire and Marine Insurance Co.*, 521 So. 2d 1298 (Ala. 1987), that an insurance company's duty "to act honestly and in good faith toward the insured" is "enhanced" when the insurer provides its insured a defense to a third-party claim under a reservation of rights.  *Id*. at 1303;[62] *see also*, *e.g.*, *Aetna Casualty & Surety Co. v.*

---

[62] The *L & S Roofing* opinion described the requirements that an insurance company must satisfy when when attempting to fulfill its "enhanced obligation" as follows:

> "*This enhanced obligation is fulfilled by meeting specific criteria. First, the*

18

*Mitchell Brothers, Inc.*, 814 So.2d 191, 195 (Ala. 2001) ("[W]hen an insurance company

*company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries*. Second, it must retain competent defense counsel for the insured. Both retained defense counsel and the insurer must understand that only the insured is the client. *Third, the company has the responsibility for fully informing the insured not only of the reservation-of-rights defense itself, but of all developments relevant to his policy coverage and the progress of this lawsuit*. Information regarding progress of the lawsuit includes disclosure of all settlement offers made by the company. Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.

"In addition to the above specific criteria to be met by the company, defense counsel retained by insurers to defend insureds under a reservation of rights must meet distinct criteria as well. First, it is evident that such attorneys owe a duty of loyalty to their clients. Rules of Professional Conduct 5.4(c) prohibits a lawyer, employed by a party to represent a third party, from allowing the employer to influence his or her professional judgment. *In a reservation-of-rights defense, RPC 5.4(c) demand that counsel understand that he or she represents only the insured, not the company*. As stated by the court in *Van Dyke v. White*, 55 Wash. 2d 601, 613, 349 P.2d 430 (1960), '[t]he standards of the legal profession require undeviating fidelity of the lawyer to his client. No exceptions can be tolerated.' [See EC5-14, EC5-15, and DR5-105, Code of Professional Responsibility of the Alabama State Bar.]

"*Second, defense counsel owes a duty of full and ongoing disclosure to the insured*. This duty of disclosure has three aspects. First, potential conflicts of interest between insurer and insured must be fully disclosed and resolved in favor of the insured. . . . Second, all information relevant to the insured's defense, including a realistic and periodic assessment of the insured's chances to win or lose the pending lawsuit, must be communicated to the insured. Finally, all offers of settlement must be disclosed to the insured as those offers are presented. *In a reservation-of-rights defense, it is the insured who may pay any judgment or settlement. Therefore, it is the insured who must make the ultimate choice regarding settlement*. In order to make an informed decision in this regard, the insured must be fully apprised of all activity involving settlement, whether the settlement offers or rejections come from the injured party or the insurance company.

*L & S Roofing Supply Company, Inc. v. St. Paul Fire and Marine Insurance Co.*, 521 So.2d 1298, 1303 (Ala. 1987) (quoting with approval *Tank v. State Farm Fire & Casualty Co.*, 105 Wash. 2d 381, 715 P.2d 1133, 1137-39 (1986)) (emphasis and alteration in original).

19

undertakes a defense pursuant to a reservation of rights, it does so under an 'enhanced obligation of good faith' toward its insured in conducting such a defense.") (alteration supplied).

> The insurer's enhanced duty of good faith arises in a reservation-of-rights situation because, according to the insurance contract, the insurer has a duty to represent the insured on covered claims. A reservation of rights allows the insurer to challenge its liability on the underlying claim while still fulfilling its duty to represent the insured. Because of the potential conflicts inherent in such an arrangement, the enhanced duty of good faith "put[s] in place a procedure by which the insured can be confident that his interests will not be compromised nor in any way subordinated to those of the insurer as a result of the defense he is required to accept under the contract of insurance." *L & S Roofing*, 521 So. 2d at 1304. As the Washington Supreme Court explained in *Tank v. State Farm Fire & Casualty Co.*, "'[a] reservation of rights agreement is not a license for an insurer to conduct the defense of an action in a manner other than [the manner in which] it would normally be required to defend. The basic obligations of the insurer to the insured remain in effect.'" 105 Wash. 2d at 387, 715 P.2d at 1137, quoting *Weber v. Biddle*, 4 Wash. App. 519, 524, 483 P.2d 155, 159 (1971) [*sic*].

> Thus, an insurer's duty to defend the insured under the enhanced duty of good faith stems from the insurer's duty of representation in the underlying insurance contract. Since the release of our decision in *L & S Roofing*, whenever an insurer defends the insured under a reservation of rights, the enhanced duty of good faith is read into that reservation of rights. *Hence, the enhanced duty arises under the insurance contract*, because no reservation of rights would take place without the underlying duty of the insurer to defend the insured, and that duty is created by that contract. Because the enhanced duty arises from the contract, it follows that *claims alleging a breach of the enhanced duty of good faith are contract claims.*

*Twin City Fire Insurance Co. v. Colonial Life & Accident Insurance Co*. 839 So. 2d

614, 616 (Ala. 2002) (emphasis supplied).  As noted in the introduction to this opinion,

however, Avis Certain consents to the dismissal of the Estate's counterclaim for breach

of the contract's enhanced obligation of good faith (Count Two).  Even if she had not

done so, Alabama law does not permit the recovery of damages for mental anguish or

punitive damages for breach of contract.[63]

Alabama law also provides that an insured's suit against his or her insurance carrier

for failing to settle a third-party claim within policy limits may be based upon a theory of

*negligence*, or an intentional, *bad faith* act on the part of the insurer, or *both*.[64]

---

[63] *See Ruiz de Molina v. Merritt & Furman Insurance Agency, Inc.*, 207 F.3d 1351, 1359 (11th Cir. 2000) (holding that Alabama law "'does not permit recovery for personal injury, inconvenience, annoyance or mental anguish and suffering in an action for breach of a contract of insurance'") (quoting *Vincent v. Blue Cross–Blue Shield, Inc.*, 373 So. 2d 1054, 1056 (Ala. 1979)); *see also*, *e.g.*, *Hobson v. American Cast Iron Pipe Co.*, 690 So. 2d 341, 344 (Ala. 1997) (holding that "neither damages for emotional distress nor punitive damages are appropriate" for breach of contract).

[64] *See Waters v. American Casualty Co.*, 261 Ala. 252, 258, 73 So. 2d 524, 528 (1953) (*per curiam*) ("We hold that there may be liability under both rules and properly drawn counts based either on negligence or bad faith should be held good, and separate counts, one charging negligence and one charging bad faith may be joined in the same complaint."). *Waters* was the first Alabama case to hold that an insurance company may be held liable for failing to accept a reasonable demand within the insured's policy limits under either a theory of negligence, or bad faith, or both.  The State Supreme Court, after explaining that the mere failure to settle a third-party claim within policy limits was not, alone, evidence of negligence, added this:

> There is a field of operation for both aspects of liability: that is, negligence in one, and bad faith in the other.  We cannot set aside the principle of liability for negligently performing a contract as set forth in the opinion *supra*.  It may arise when an insurer is engaged in performing his contractual duty owing to the insured to defend the suit.  The law raises a duty not contractual, but by reason of the contract, to exercise ordinary diligence in doing so.  A failure to exercise ordinary diligence proximately causing damage to the insured is actionable in tort.  The contract of insurance gives the insurer the exclusive right to make a settlement of the claim

21

When an insurer negligently fails to settle a third-party claim within its insured's policy limits — *that is*, failed to exercise "such care as a reasonably prudent insurer would have exercised under the same or similar circumstances" when deciding not to settle within policy limits[65] — the company may be liable to its insured for compensatory damages.[66]  Recoverable damages may include mental distress or economic loss,[67] but not attorney's fees.[68]

When an insurer intentionally, or "in bad faith" fails to settle a third-party claim

---

against insured.  That right imposes a corresponding duty raised by law to observe ordinary diligence in performing that power, when in the exercise of it.  So that, when an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability, the law raises a duty on his part to use ordinary care to ascertain the facts on which its performance depends if he has not already done so.  If the insurer neglects to exercise ordinary diligence in ascertaining these facts, if he has not already done so, and as a proximate result of such neglect he fails to make such a settlement, which is available, and when such knowledge would have caused a reasonably prudent person to do so, and a verdict and judgment are rendered against insured in an amount more than the limit of liability in the policy, the insurer should be held liable to the insured for the full amount of the judgment.

*Waters v. American Casualty Co*., 261 Ala. at 260-61, 73 So. 2d at 531-32.  *See also*, *e.g.*, *Evans v. Mutual Assurance, Inc*. 727 So. 2d 66 (Ala. 1999).

[65] 1 *Alabama Pattern Jury Instructions — Civil* § 20.40 (3rd ed. 2012).

[66] *See*, *e.g.*, Jenelle Mims Marsh, *Alabama Law of Damages* § 27:6(a) (2012); John Johnson II & Richard E. Smith, *Allen's Alabama Liability Insurance Handbook* § 13.19[1] (2d ed. 2008).

[67] *See*, *e.g.*, 1 Alabama Pattern Jury Instructions — Civil § 20.39 (3rd ed. 2012).  *Cf. Chavers v. National Security Fire and Casualty Co*., 405 So. 2d 1, 7 (1981).

[68] *See*, *e.g.*, *Hartford Accident & Indemnity Co. v. Cosby*, 173 So. 2d 585, 595 (1965) (holding that attorneys' fees are not recoverable in a bad faith action against the insurer); *Inland Mutual Ins. Co. v. Hightower*, 274 Ala. 52, 145 So. 2d 422, 431 (1962) (insurer entitle to defend a declaratory judgment action without exposing itself to liability to the insured for attorneys' fees).

within its insured's policy limits, and the plaintiff satisfies the requirements of Alabama Pattern Civil Jury Instruction 11.03, the company may also be liable to its insured for punitive damages, which may be as much as "the full amount of the judgment against the insured."[69]

In other words, "compensatory damages are appropriate when negligence is found, and punitive damages are appropriate only where the requirements of APJI 11.03 (standards for punitive damages) are met."[70]

The three principles that control the disposition of the present case, however, can be stated as follows.  First, the Estate's counterclaims against MetLife for negligently, recklessly, and wantonly failing to settle the underlying suit (Count Three), and for "intentionally and in bad faith" failing to settle the underlying suit within policy limits (Count Four), are tort claims.  Tort claims are personal to the insured.  If personal tort claims are not filed prior to the insured's death, they do not survive in favor of the insured's Estate under Alabama law.  *See*, *e.g.*, Ala. Code § 6-5-462 (1975) (2005 Replacement Vol.); *Continental National Indemnification Co. v. Fields*, 926 So. 2d 1033, 1037 (Ala. 2005); *Bassie v. Obstetrics & Gynecology Associates of Northwest Alabama, P.C.*, 828 So. 2d 280, 282 (Ala. 2002); *Gillilan v. Federated Guaranty Life*

---

[69] Marsh, *Alabama Law of Damages* § 27:6(a) & n.5.

[70] 1 *Alabama Pattern Jury Instructions — Civil* § 20.40, Comm. Cmt.

*Insurance Co.*, 447 So. 2d 668, 674 (Ala. 1984). *Cf. Sanford v. Western Life Insurance Co.*, 368 So. 2d 260, 263 (Ala. 1979) ("The fraud action [on an insurance contract] brought by Sanford is *Ex delicto* in nature. As such, it does not survive in favor of the personal representative of a deceased person under the provisions of [Alabama Code §] 6-5-462.") (alterations supplied).

As previously noted, James P. Certain died on September 2, 2011, and the counterclaims against Metlife were not filed until June 29, 2012. Accordingly, those counterclaims that sound in tort (Counts Three and Four) did not survive the death of James Certain in favor of his personal representative of his Estate, Avis Certain. Thus, those counterclaims are due to be dismissed.

Alternatively, the Eleventh Circuit has clearly held that "Alabama law require[s] insurance coverage as a prerequisite for liability for a bad faith failure to settle a claim with the insurance company's money . . . ." *Twin City Fire Insurance Co. v. Colonial Life & Accident Insurance Co.*, 375 F.3d 1097, 1101 (11th Cir. 2004). In the present case, the plain language of James P. Certain's homeowner's insurance policy clearly excludes coverage for "bodily injury . . . which is reasonably expected or intended by you or which is the result of your intentional and criminal acts or omissions," "bodily injury caused by or resulting from the actual, alleged or threatened sexual molestation or contact, corporal punishment, physical abuse, mental abuse or emotional abuse of a person," and

24

"bodily injury caused by or resulting from emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury."[71]

The undisputed facts in this case clearly demonstrate that James P. Certain's acts were intentional, criminal, and of a sexual nature. Thus, as a matter of law, Metlife owed no duty to defend or provide coverage for James P. Certain acts under the terms of its policy.[72]  As Metlife cannot be liable for an intentional *or* negligent failure to execute a duty that it had no obligation to perform, the Estate's remaining counterclaims must necessarily be dismissed on the alternative ground that Metlife owed no duty to settle within policy limits.  *See Twin City Fire Insurance Co.,* 375 F.3d at 1101 ("[O]ne who cannot prove she was entitled to benefits under an insurance policy cannot recover on a bad faith failure to settle claim.") (citing *State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 318 (Ala. 1999)) (alteration supplied); *see also Slade*, 747 So. 2d at 317 ("After thoroughly reviewing Alabama law on the tort of bad faith, we are convinced that when this Court recognized the tort of bad faith, it intended to limit liability under that tort to those instances in which the insured's losses were covered under the policy.").

---

[71] *See supra* the text accompanying note 23.

[72] Though this did not exclude Metlife's voluntarily undertaken duty to defend Certain under a reservation of rights, which is separate and distinct from Metlife's duties (or lack thereof) under the homeowner's policy, any violations of Metlife's "enhanced obligation of good faith" accrued under contract and, thus, were rendered moot upon Metlife's voluntary satisfaction of the judgment entered against the Estate.  *See Twin City Fire Insurance Co. v. Colonial Life & Accident Insurance Co.,* 839 So. 2d 614, 616 (Ala. 2002) ("[C]laims alleging a breach of the enhanced duty of good faith are contract claims.") (alteration supplied).

## CONCLUSION

In accordance with the parties' stipulations, it is ORDERED that MetLife's amended complaint for declaratory relief, and, Counts One and Two of the Estate's counterclaim are DISMISSED.  It is further ORDERED that MetLife's motions to dismiss and for summary judgment are GRANTED, and Counts Three and Four of the Estate's counterclaim are DISMISSED.  The Estate's motion for partial summary judgment is DENIED.  All other motions are overruled as moot.  Costs are taxed to the party who or which incurred them.  The Clerk is directed to close this file.

**DONE** and **ORDERED** this 23rd day of December, 2013.

_____
United States District Judge

26